IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARYN GRATZ | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KEREY RUGGIERO, et al. | : | NO. 16-3799 |

## MEMORANDUM

**Padova, J.**                                                                    **May 19, 2017**

Plaintiff Caryn Gratz asserts claims pursuant to the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-68, and state law against Defendants Philadelphia Mental Health Clinic, Inc. ("PMHC"), and against Kerey Ruggiero, Donna Moran, Staffmore, LLC, Behavioral Healthworks, LLC, Ruggiero LLC, and Anthony A. Wolf, Inc. (collectively, the "Ruggiero Defendants").   PMHC and the Ruggiero Defendants have both filed Motions to Dismiss.   PMHC asks that we dismiss four of the five Counts asserted against it, and the Ruggiero Defendants ask that we dismiss the two RICO Counts asserted against them.   For the following reasons, we deny both Motions.

## I.      BACKGROUND

The Complaint alleges that, from January 5, 2015 through February 2, 2016, Gratz was the Chief Operating Officer of PMHC, a non-profit corporation that provides mental health services to certain children and is compensated for its services with Medicaid funds.   (Compl. ¶¶ 8-9, 11, 23.) Defendant Kerey Ruggiero is the Executive Director and Chief Executive Officer of PMHC. (Id. ¶¶ 1, 7.)   Defendants Staffmore, LLC, Behavioral Healthworks, LLC, Anthony A. Wolf, Inc., and Ruggiero LLC are for-profit companies in which Ruggiero holds a controlling interest.   (Id. ¶¶ 14, 17-19.)   Defendant Donna Moran has held various positions at PMHC in the past, and is currently the Executive Director of Staffmore and a Director of Behavioral Healthworks.   (Id. ¶¶ 15, 16.)

The Complaint alleges that the Ruggiero Defendants "orchestrated a scheme to divert PMHC's funds away from its charitable purpose and into their own pockets." (Id. ¶ 1.) Specifically, the Complaint alleges that Ruggiero and Moran "made large, regular [electronic] payments from PMHC to [Staffmore, Behavioral Healthworks, Wolf, and Ruggiero LLC] and disguised the payments as program and administrative expenses incurred by PMHC in the operation of its business." (Id. ¶ 1.) Using this scheme, Ruggiero and Moran were able to conceal their income on tax returns they mailed and wired to the Internal Revenue Service, thereby avoiding tax penalties on excess compensation, and Ruggiero was able to evade taxes altogether. (Id.)

Immediately prior to joining PMHC in 2015, Gratz was the Managing Director for Behavioral Health Services at Pubic Health Management Corporation ("PHM"), another non-profit organization. (Id. ¶¶ 3, 28, 32.) According to the Complaint, Ruggiero, Moran and PMHC "lured" Gratz away from that position "in order to gain [her] unwitting assistance to maintain their scheme to divert funds away from PMHC's charitable purpose." (Id. ¶ 3.) To accomplish that purpose, Ruggiero "falsely represented the nature of PMHC's operations and falsely stated the reasons for PMHC's financial plight." (Id. ¶ 44.)

Gratz began working at PHMC pursuant to a three year contract. (Id. ¶ 24.) During her first six months of employment, "Gratz gradually discovered that PMHC had several contracts with Ruggiero's for-profit corporations whereby PMHC paid an inflated sum for various services that are normally handled in house or would ordinarily be contracted for at a much lower rate to a legitimate third party provider." (Id. ¶ 87.) Gratz also discovered that PMHC was paying inflated rent for properties owned by or controlled by Ruggiero, that PMHC funds were bring used to pay Ruggiero's personal expenses, and that PMHC had made undocumented loans to Ruggiero

that were never repaid.  (Id. ¶¶ 97-99, 101.)  When Gratz confronted Ruggiero and Moran about Ruggiero's self-dealing, she was assured that Ruggiero's conduct was both lawful and board-approved.  (Id. ¶¶ 104-06.)  Moreover, Ruggiero assured Gratz that she was committed to Gratz's cost-cutting initiatives.  (Id. ¶ 116.)  In spite of these assurances, Gratz could find no evidence that the board had approved Ruggiero's actions, and Ruggiero's self-dealing continued. (Id. ¶¶ 108-09.)

In early January 2016, Gratz formally launched an initiative for PMHC to directly hire service providers rather than obtaining them though Ruggiero's staffing companies.  (Id. ¶¶ 128-29.)  She also began speaking regularly to Geoffrey Rupprecht, PHMC's CFO, about her concerns about Ruggiero's self-dealing and lack of board approval for various contracts, as well as her belief that Ruggiero's conduct was illegal.  (Id. ¶¶ 125, 130, 132.)  She "informed Rupprecht that she believed that no Board meetings were being conducted and that Ruggiero was misrepresenting Board directives that Ruggiero claimed had approved PMHC's fiscally irresponsible transactions diverting PMHC funds away from their charitable purpose and into Ruggiero's pockets."  (Id. ¶ 151.)  On January 27, 2016, Gratz told Rupprecht that they needed to make copies of documents evidencing Ruggiero's self-dealing and turn them over to the attorney general.  (Id. ¶¶ 163, 165-66.)  Two days later, Ruggiero expressed open hostility towards Gratz and pushed back against Gratz's cost-cutting initiatives.  (Id. ¶¶ 172-75.)  Shortly thereafter, on February 2, 2016, Ruggiero terminated Gratz's employment with PHMC.  (Id. ¶¶ 26, 177.)  When Ruggiero did so, she presented Gratz with a Confidentiality and Release Agreement and told Gratz that if she signed the release at that very moment, Ruggiero would provide her with two months' salary, but that if she refused to sign it, the offer was "off the table."  (Id. ¶ 181, 184.)  Gratz, however, refused to sign the Release under those conditions, and she never signed the

Release.   (Id. ¶ 186.)

The Complaint asserts five counts.[1]   Counts I and II assert RICO claims against all seven Defendants pursuant to § 1962(c) and § 1962(d), respectively.[2]   Count III asserts a state law common law claim against PMHC for wrongful termination of employment in violation of public policy.   Count IV asserts a claim against PMHC pursuant to the Pennsylvania Whistleblower Law, 43 Pa. Cons. Stat. Ann. §§ 1421-28.   Count V asserts a state law claim against PMHC for breach of Gratz's employment contract.   PMHC has moved to dismiss the claims against it in Counts I through IV, and the Ruggiero Defendants have moved to dismiss the claims against them in Counts I and II.

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we consider "the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).   We "may also consider the RICO Case Statement filed by Plaintiff[,] which 'is a pleading that may be considered part of the operative complaint for the purposes of a motion to dismiss.'"   State Farm Mut. Auto. Ins. Co. v. Makris, Civ. A. No. 01-5351, 2003 WL 924615, at *4 (E.D. Pa. Mar. 4, 2003) (quoting Allen

---

[1] The Complaint initially included six counts, but Gratz has voluntarily withdrawn Count VI, which was a claim against the Ruggiero Defendants for tortious interference with Gratz's employment contract.   (See Gratz's Mem. in Opp. to Ruggiero Defs.' Mot. at 48.)

[2] Gratz's RICO Case Statement describes the RICO scheme as one "to unlawfully convert millions of dollars from a nonprofit corporation into [Defendants'] own pockets, all the while disguising their conversions as nonprofit business expenses in order to avoid paying taxes or tax penalties on the income they were taking."   (Gratz's RICO Case Statement at 1; see also Compl. ¶ 245.)

Neurosurgical Assocs., Inc., v. Lehigh Valley Health Network, Civ. A. No. 99–4653, 2001 WL. 41143, at *3 n.1 (E.D. Pa. Jan.18, 2001)).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.   DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)).   Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"   Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).   The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"   Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).   "A complaint that pleads facts 'merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief.'" Connelly v. Lane Constr. Corp., 809 F.3d 780, 786 (3d Cir. 2016) (alteration in original) (quoting Iqbal, 556 U.S. at 678).   "The plausibility determination 'is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"   Id. 786-87 (quoting Iqbal, 556 U.S. at 679).   In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above

the speculative level.'" <u>W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank</u>, 712 F.3d

165, 169 (3d Cir. 2013) (quoting <u>Twombly</u>, 550 U.S. at 555).

## III. DISCUSSION

PMHC and the Ruggiero Defendants both argue that that we should dismiss the RICO

counts against them because Gratz does not have standing to pursue a RICO claim. In the

alternative, PMHC and the Ruggiero Defendants argue that we should dismiss those same counts

because they do not adequately allege the elements of a RICO claim. PMHC also argues that we

should dismiss the Pennsylvania Whistleblower Law claim against it because that Law applies

only to public bodies, not non-profits, and that we should dismiss the wrongful discharge claim

because such a claim can only be pursued by at-will employees.

### A. RICO

The RICO statute authorizes civil suits by "any person injured in his business or property

by reason of a violation of [18 U.S.C. § 1962]." 18 U.S.C. § 1964(c). Here, the Complaint

alleges violations of subsections 1962(c) and (d).

Section 1962(c) makes it "unlawful for any person employed by or associated with any

enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or

indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . .

." 18 U.S.C. § 1962(c). To state a claim under Section 1962(c), a plaintiff must allege "(1)

conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." <u>Warden v.

McLelland</u>, 288 F.3d 105, 114 (3d Cir. 2002) (quotation omitted). The RICO statute defines

"racketeering activity" to include many state and federal crimes, including wire fraud, mail fraud,

and witness tampering. 18 U.S.C. § 1961(l). A "pattern" requires "at least two acts of

racketeering activity" that occur within a ten-year period. 18 U.S.C. § 1961(5). To prove a

pattern of racketeering activity, a plaintiff must show that "the racketeering predicates are related, and that they amount to or pose a threat of continued . . . activity." H.J., Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989). Racketeering activities are related if they "'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" Id. at 240 (quoting 18 U.S.C. § 3575(e)); Mega Concrete v. Smith, Civ. A. No. 09-4234, 2013 WL 3716515, at *10 (E.D. Pa. July 15, 2013) (citing H.J., Inc., 492 U.S. at 239-40).

Section 1962(d) provides for a RICO conspiracy claim, making it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." 18 U.S.C. § 1962(d). To state a claim under § 1962(d), "'a plaintiff must allege (1) agreement to commit the predicate acts . . . , and (2) knowledge that those acts were a part of a pattern of racketeering activity conducted in such a way as to violate section 1962(a), (b) or (c).'" Grant v. Turner, 505 F. App'x 107, 112 (3d Cir. 2012) (quoting Rose v. Bartle, 871 F.2d 331, 366 (3d Cir. 1989)). While "a defendant need not himself commit or agree to undertake all acts necessary to make out a § 1962(c) violation," he must "agree to facilitate the commission of activities prohibited under RICO." Mega Concrete, 2013 WL 3716515, at *16 (citing Salinas v. United States, 522 U.S. 52, 65 (1997); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 372–73 & n.71 (3d Cir. 2010); Smith v. Berg, 247 F.3d 532, 538 (3d Cir. 2001)).

## 1. Standing

Generally, in order to have standing to bring a RICO claim pursuant to § 1964(c), a plaintiff must establish "(1) that he was injured (2) by reason of a violation of § 1962."[3] Anderson

---

[3] "Civil RICO 'standing' is usually viewed as a 12(b)(6) question of stating an actionable claim, rather than as a 12(b)(1) question of subject matter jurisdiction." Anderson v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005) (citing Maio v. Aetna, Inc., 221 F.3d 472, 482 n.7 (3d Cir. 2000)).

v. Ayling, 396 F.3d 265, 269 (3d Cir. 2005). To establish standing, a plaintiff must "allege that he or she was injured by 'an act that is independently wrongful under RICO,' and not merely by a non-racketeering act in furtherance of a broader RICO conspiracy." Id. (quoting Beck v. Prupis, 529 U.S. 494, 505-06 (2000)). Furthermore, "a RICO plaintiff must show that defendant's RICO violation was not only a 'but for' cause of his injury, but also that it was the proximate cause." Id. (citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268 (1992)). This means that there must be a "direct relation between the injury asserted and the injurious [racketeering] conduct alleged." Holmes, 503 U.S. at 268.

PMHC and the Ruggiero Defendants both argue that we should dismiss Gratz's RICO claims for lack of standing. Their primary argument appears to be that Gratz alleges only that she was injured by the termination of her employment, which is not itself "an act that is independently wrongful under RICO." Anderson, 396 F.3d at 269 (quotation omitted); Beck, 529 U.S. at 500, 505-06 (holding that where plaintiff alleged that he was injured by the termination of his employment, which was an overt act in furtherance of a conspiracy, but not an act that was independently wrongful under RICO, he did not have a RICO cause of action.) However, contrary to Defendants' characterization, the Complaint alleges that Gratz was injured by three predicate acts of racketeering. First, it alleges that Defendants committed wire fraud insofar as they used the wires to lure her away from her position at PHM based on false representations as to the reasons for PMHC's financial condition and Ruggiero's commitment to working with Gratz to improve PMHC's profitability, and that Gratz was injured by that wire fraud insofar as she gave up her position, earnings, and future opportunities at PHM. (Compl. ¶¶ 227(a), 237, 246.) Second, it alleges that Defendants committed wire fraud insofar as they intentionally misled Gratz to convey inaccurate information to Community Behavioral Health ("CBH") to increase referrals to

PMHC to increase its revenue, and that Gratz was injured by this wire fraud insofar as her conveyance of inaccurate information damaged her reputation with CBH.[4]  (Id. ¶¶ 238, 246.) Third, it alleges that Defendants committed witness tampering in violation of 18 U.S.C. § 1512, insofar as they wrongfully terminated Gratz's employment contract and pressured her to sign a confidentiality agreement to prevent her from further investigating and reporting their crimes and self-dealing, and that Gratz was injured by this witness tampering insofar as her employment contract was breached.  (Id. ¶¶ 240-41, 246.)  Accordingly, we reject Defendants' argument that the Complaint alleges only that Gratz suffered injury as a result of the termination of her employment and does not allege that she was injured as the result of RICO predicate acts.[5]

Defendants may be proceeding under a theory that any alleged wire fraud or witness tampering associated with Gratz's hiring, employment, and firing simply cannot be considered legitimate predicate acts in the alleged racketeering scheme, because that scheme is a tax avoidance scheme and Defendant's alleged misconduct conduct with respect to Gratz is not sufficiently related to that scheme to be considered part of the pattern of alleged racketeering activity.  See generally H.J., Inc., 492 U.S. at 239 (requiring a RICO plaintiff to show that "the racketeering predicates are related"); see also Shearin v. E.F. Hutton Grp., Inc., 885 F.2d 1162,

---

[4] At some point in time before joining PMHC in 2015, Gratz had served as the "Coordinator for Children's Services" for CBH.  (Compl. ¶ 28.)   In addition, from 1999 to 2004, she had served as Agency Director of PMHC.  (Id. ¶ 35.)  One of Gratz's accomplishments during her previous tenure with PMHC had been to "enhance the delivery of services to disabled children," which resulted in more referrals from CBH and "dramatically improv[ed] PMHC's financial condition."  (Id. ¶ 36.)

[5] PMHC asserts that the only action that directly harmed Gratz was her termination, but then argues only that Defendants' alleged attempts to force Gratz to sign a confidentiality agreement resulted in no injury at all.   It therefore makes no attempt to explain why the injuries that Gratz allegedly suffered from the alleged wire fraud and other alleged witness tampering do not constitute direct injuries.   In the absence of any argument on that issue, we will not conclude at this stage of the proceedings that Gratz's alleged injuries were not direct.

1168 (3d Cir. 1989) (addressing a RICO plaintiff's claim of fraudulent hiring by wire fraud and concluding that "the relation of the alleged fraudulent hiring to the [racketeering] scheme is too attenuated to be considered part of the same pattern of racketeering activity.") However, Plaintiff's RICO Case Statement asserts that the alleged predicate acts involving Gratz's hiring and employment were an integral part of the RICO racketeering scheme because "Defendants' objective in procuring and maintaining Gratz'[s] services was to increase PMHC's revenue to increase the sums that Defendants were able to unlawfully divert." (RICO Case Statement at 32.) Likewise, it asserts that Gratz's "wrongful termination is related to the scheme as the termination was to prevent Graz'[s] efforts to impede Defendants' scheme and to prevent Gratz'[s] effort to eliminate the scheme altogether by reporting it to government authorities." (Id.) Moreover, Defendants have developed no identifiable legal argument concerning relatedness from which we could conclude that the alleged predicate acts associated with Gratz are not sufficiently related to be considered part of the alleged RICO racketeering scheme. Accordingly, without the benefit of legal argument on this point, we decline to conclude at this stage of the proceedings that the alleged predicate acts based on Gratz's hiring, employment, and firing are not sufficiently related to the racketeering scheme to be pertinent to our standing analysis.

We also reject the Ruggiero Defendants' argument that the Complaint fails to adequately allege that the RICO enterprise and conspiracy were the proximate cause of Gratz's alleged injuries. The United States Court of Appeals for the Third Circuit has stated that there is a six-factor test for determining whether injuries were proximately caused by a RICO predicate act. Pursuant to that test, a court is to consider:

> "(1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury . . . ; (4) the directness or indirectness of the asserted injury; (5) whether the damages claim is . . . highly speculative; and (6) keeping the scope of

complex . . . trials within judicially manageable limits, i.e., avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

Anderson, 396 F.3d at 270 (first and second alterations in original) (quoting Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 924 (3d Cir. 1999) (internal quotation marks omitted)).   However, in applying this test and arguing that the RICO predicate acts cannot be considered the proximate cause of Gratz's injuries, the Ruggiero Defendants again define the relevant predicate acts as only those that they unilaterally consider to be part of the tax avoidance racketeering scheme.   (See Ruggiero Defs.' Mem. at 7 (arguing that there is no causal connection between the diversion of money from PMHC's charitable purpose and Gratz's firing and that the injuries from the claimed tax evasion plot only "impact the fisc").)   They therefore fail to adequately address whether the Complaint plausibly alleges that the wire fraud and witness tampering that Gratz alleges to have caused her injuries were the proximate cause of those injuries.[6]   Under these circumstances, the Ruggiero Defendants have failed to satisfy their burden on establishing that the RICO counts fail to adequately allege proximate cause.

For all of these reasons, Defendants have failed to establish that Gratz lacks standing to assert her RICO claims.   We therefore deny Defendants' Motions insofar as they seek dismissal of the RICO claims for lack of standing.

_____

[6] In addressing the third factor, i.e., the nature of the alleged injury, the Ruggiero Defendants contend that "job loss and income loss" are not "injur[ies] typically cognizable under RICO standing requirements."   (Ruggiero Defs.' Mem. at 7.)   However, the Third Circuit has suggested otherwise insofar as it has specifically stated that "it is possible that a predicate act of racketeering that *directly* caused a plaintiff to lose his job could create civil RICO standing." Anderson, 396 F.3d at 269-70.

## 2. Failure to Allege Plausible Claims

### a. § 1962(c) based on Mail and Wire Fraud

Defendants argue that the § 1962(c) claim against them should be dismissed, at least insofar as it is based on mail and wire fraud, because the Complaint fails to allege the fraudulent communications that constitute the fraudulent scheme with the requisite specificity. "Where a plaintiff relies on mail and wire fraud as a basis for a RICO violation, 'the allegations of fraud must comply with Federal Rule of Civil Procedure 9(b), which requires that allegations of fraud be pled with specificity.'" Sarpolis v. Tereshko, 26 F. Supp. 3d 407, 428–29 (E.D. Pa. 2014) (quoting Lum v. Bank of Am., 361 F.3d 217, 223 (3d Cir. 2004)), aff'd, 625 F. App'x 594 (3d Cir. 2016); Fed. R. Civ. P. 9(b). In order to plead a § 1962(c) claim with particularity, a plaintiff must either "'plead with particularity the circumstances of the alleged fraud'" or "offer some alternative means of injecting precision and some measure of substantiation into her allegations of fraud." Forrest v. Owen J. Roberts Sch. Dist., Civ. A. No. 09-3014, 2011 WL 1549492, at *13 (E.D. Pa. Apr. 1, 2011) (quoting Lum, 361 F.3d at 223, and citing Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984)). When pleading the circumstances of the alleged fraud, a plaintiff "'must identify the purpose for the communication within the defendant's fraudulent scheme and specify the fraudulent statement, the time, the place, and the speaker and content of the alleged misrepresentation.'" Id. (quoting Werther v. Rosen, Civ. A. No. 02–3589, 2002 WL 31955983, at *2 (E.D. Pa. Oct. 30, 2002)). The RICO Complaint must also "explain how specific, identified mailings [or] interstate wire communications . . . 'were false or misleading, or how they contributed to the alleged fraudulent scheme.'" Id. (quoting Warden v. McLelland, 288 F.3d 105, 114 (3d Cir. 2002)).

Here, in spite of Defendants' assertions to the contrary, we conclude that the Complaint alleges the scheme with sufficient particularity to "inject[] precision and some measure of substantiation into [the] allegations of fraud." Forrest, 2011 WL 1549492, at *13 (quotation omitted). Without reiterating the extensive allegations of the Complaint, we note that, with respect to the wire fraud involving in Gratz's hiring, the Complaint alleges that in October and November of 2014, Ruggiero used the wires to solicit Gratz away from PHM with misrepresentations regarding, inter alia, the reasons for PMHC's financial difficulties. (See Compl. ¶¶ 40-44, 46.) In addition, with respect to wire fraud that took place during the course of Gratz's employment, the Complaint alleges that in telephone calls on January 29, 2015 and April 2, 2015, Ruggiero fraudulently represented to Gratz that she was committed to cutting costs when, in fact, she was continuing to engage in self-dealing, and Gratz unknowingly relied on these misrepresentations in negotiating with, and seeking funding from CBH. (Compl. ¶¶ 68-70, 116, 121-23.) Accordingly, we deny Defendants' Motions to the extent that they ask us to dismiss the RICO claims grounded in fraud for lack of particularity.

### b.      § 1962(c) based on Witness Tampering

The Ruggiero Defendants argue that we should dismiss the § 1962(c) claim insofar as it is based on witness tampering because the Complaint does not allege facts that support a cognizable claim of witness tampering. Specifically, they argue that, in the absence of an ongoing proceeding, any actions that Defendants took with respect to Gratz could not constitute witness tampering under 18 U.S.C. § 1512. However, the Ruggiero Defendants cite no legal authority in support of their argument. Moreover, § 1512 specifically states that, for purposes of the section, "an official proceeding need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(f)(1); see also United States v. Davis, 183 F.3d 231, 248 (3d Cir.) (stating that "§

1512 does not require an official proceeding to be pending or imminent at the time of the offense"
and that "[a] reasonable belief that the named witness will communicate information to a law
enforcement officer is enough to create liability under the statute." (citing <u>United States v. Kozak</u>,
438 F.2d 1062, 1066 (3d Cir. 1971))), amended, 197 F.3d 662 (3d Cir. 1999). Accordingly, we
deny the Ruggiero Defendants' Motion to Dismiss insofar as it seeks dismissal of Gratz's RICO
claim grounded in witness tampering based on the Complaint's failure to allege an ongoing
proceeding.

### c.     Conspiracy pursuant to § 1962(d)

Defendants also argue that we should dismiss the § 1962(d) conspiracy claim for failure to
state a claim upon which relief can be granted. As noted above, a plaintiff asserting a conspiracy
claim under § 1962(d), "must allege (1) agreement to commit the predicate acts . . . , and (2)
knowledge that those acts were a part of a pattern of racketeering activity conducted in such a way
as to violate section 1962(a), (b) or (c)." <u>Grant</u>, 505 F. App'x at 112 (quotation omitted). Unlike
allegations of fraud, "'allegations of conspiracy are not measured under the . . . [Fed. R. Civ. P.]
9(b) standard, which requires greater particularity of allegation of fraud, but are measured under
the more liberal . . . [Fed. R. Civ. P. 8(a)] pleading standard.'" <u>The Knit With v. Knitting Fever,
Inc.</u>, Civ. A. No. 08-4221, 2011 WL 1161716, at *4 (E.D. Pa. Mar. 30, 2011) (alterations in
original) (quoting <u>Odesser v. Cont'l Bank</u>, 676 F. Supp. 1305, 1313 (3d Cir. 1987)), <u>aff'd</u>, 625 F.
App'x 27 (3d Cir. 2015). "Nevertheless, it is not enough for a complaint to simply make
'conclusory allegations of concerted action but [be] devoid of facts actually reflecting joint
action.'" <u>Id.</u> (alteration in original) (quoting <u>Abbott v. Latshaw</u>, 164 F.3d 141, 148 (3d Cir.
1998), and citing <u>District 1199P Health & Welfare Plan v. Janssen, L.P.</u>, Civ. A. Nos. 06–3044,
07–2224, 07–2608, 07–2860, 2008 WL 5413105, at *15–16 (D.N.J. Dec. 23, 2008)).

The Ruggiero Defendants contend that the Complaint does not allege that Defendants agreed to commit the predicate acts of fraud and, instead, merely references standard business agreements for the purchase of services, asserts that the services were sold at inflated prices, and expresses garden-variety dissatisfaction with Ruggiero's business decisions.   In fact, however, the Complaint alleges that Ruggiero, who was an officer or had a controlling in all of the corporate Defendants, and Moran, who was an officer of Defendants Staffmore and Behavioral Healthworks, worked together to direct patently exorbitant payments from PMHC to the other corporate Defendants, and then siphoned off the proceeds for their own benefits.   (Compl. ¶¶ 1, 7, 14-15, 17-19, 86.)   Moreover, the Complaint plausibly alleges that at least certain business agreements at issue not only provided for the purchase of Defendants' services at inflated prices, but had "no legitimate business justification . . . other than to funnel surplus revenue to Ruggiero and to disguise her excess compensation as a legitimate business expense."   (Id. ¶ 91; see also id. ¶ 92.)   Upon consideration of these and the other allegations in the Complaint, we conclude that the facts alleged are sufficient to give rise to a reasonable inference of an agreement among the Defendants to engage in the alleged racketeering scheme.   Accordingly, we deny the Ruggiero Defendant's Motion to Dismiss as to the § 1961(d) conspiracy claim.

PMHC, unlike the Ruggiero Defendants, does not identify a specific pleading deficiency with regard to the conspiracy claim, but merely asserts generally that the claim is not pled with particularity.   We conclude, to the contrary, that the Complaint plausibly alleges the two elements of a RICO conspiracy and does not rely solely on "conclusory allegations of concerted action." Knit With, 2011 WL 1161716, at *4.   Therefore, we also deny PMHC's Motion to Dismiss with respect to the § 1962(d) conspiracy claim.

Consequently, we deny both Motions to Dismiss insofar as they seek to dismiss both of Gratz's RICO claims.

**B.     Whistleblower Law**

PHMC argues that Gratz has failed to state a claim upon which relief can be granted pursuant to the Pennsylvania Whistleblower Law because that Law only applies to employers who are public bodies, not employers who are private non-profits, and PHMC's mere receipt of Medicaid funding does not render it a public body.

The Pennsylvania Whistleblower Law makes it unlawful for an "employer" to discharge, discriminate against, or retaliate against an employee because the employee has made "a good faith report or is about to report . . . to the employer or appropriate authority an instance of wrongdoing or waste."  43 Pa. Stat. Ann. § 1423(a).  Prior to 2014, the Whistleblower Law defined "employee" to include only those individuals worked for a "public body," and defined "public body" to include only governmental bodies or other bodies "created by . . . or . . . funded . . . by . . . Commonwealth or political subdivision authority or a member or employee of that body." Id. § 1422 (1986).   Under that version of the statute, numerous courts concluded that "the receipt of Medicaid reimbursements is insufficient to make an otherwise private entity . . . a public body subject to Whistleblower Law liability."   Tanay v. Encore Healthcare, LLC, 810 F. Supp. 2d 734, 743 (E.D. Pa. 2011) (citing Cohen v. Salick Health Care, Inc., 772 F. Supp. 1521 (E.D. Pa. 1991)); see also Bickings v. NHS Human Servs, Civ. A. No. 13-2894, 2014 WL 307549, *7 (E.D. Pa. Jan. 27, 2014) (citing Tanay, 810 F. Supp. 2d 734); United States ex. rel. Notorfransesco v. Surgical Monitoring Assoc., Inc., Civ. A. No. 09-1703, 2014 WL 4375654, at *9 (E.D. Pa. Sept. 3, 2014); but see Denton v. Silver Stream Nursing & Rehab. Ctr., 739 A.2d 571, 576 (Pa. Super. Ct. 1999)

(holding that "a recipient of Medicaid funding is a 'public body' for purposes of the Whistleblower law").

However, the Pennsylvania Whistleblower Law was amended in 2014 to expand the Law's coverage. See 2014 Pa. Legis. Serv. Act 2014-87 (Purdon's). To that end, the legislature amended the definition of "employee" to include a person who works for any "employer," and amended the definition of employer to include not only public bodies, but also individuals, partnerships, associations, and both profit and not-for-profit corporations that "receive[] money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body." 43 Pa. Stat. Ann. § 1422 (2014). Moreover, the legislative history makes clear that very purpose of the amendment was to "expand coverage of the law to include employees of companies that are performing services for public bodies with public monies." Brian L Ellis, Pa. H.R. Co-Sponsorship Memoranda, H. Bill 105 (Jan. 11, 2013); see also Pa. H.R. Comm. on Appropriations Fiscal Note, H. Bill 118, Printer's No. 242 (Feb. 4, 2013).

PMHC's argument that it is not subject to liability under the Whistleblower Law does not take into account the 2014 amendments to the Law and relies on cases that interpreted the prior version of the law. We therefore reject its argument that, as a non-profit entity that merely received Medicaid funding, it is not subject to liability under the Whistleblower Law, and we deny its Motion to Dismiss insofar as it seeks dismissal of Gratz's Whistleblower claim.

### C. Wrongful Discharge

PMHC argues that Gratz has failed to state a wrongful discharge claim upon which relief can be granted because (1) such a claim can only be pursued by at-will employees, and (2) Gratz has failed to plead that her termination violated a recognized public policy.

"[U]nder Pennsylvania law, a cause of action for the tort of wrongful discharge is not available when an employment contract adequately protects employees from arbitrary termination." Ellis v. Allegheny Specialty Practice Network, Civ. A. No. 12-404, 2013 WL 411477, at *5 (W.D. Pa. Feb. 1, 2013) (citing Geary v. U.S. Steel Corp., 319 A.2d 174, 176, 180 (Pa. 1974); Phillips v. Babcock & Wilcox, 503 A.2d 36, 38 (Pa. Super. Ct. 1986); Griffin v. Municipality of Kingston, 453 Fed. App'x 250, 254 (3d Cir. 2011)). Gratz concedes that an employee who is subject to an employment contract cannot bring a wrongful discharge claim under Pennsylvania law. (Gratz's Mem. in Opp. to PMHC's Mot. at 45.) She argues, however, that she has merely pled her wrongful discharge claim in the alternative, to protect against a circumstance in which PMHC argues that she was not subject to an employment contract. And, indeed, PMHC states in its Memorandum in Support of its Motion to Dismiss that it "specifically reserves the right to contest the allegations that Plaintiff entered into an employment contract with PMHC." (PMHC Mem. at 8 n.1.) Under these circumstances, Gratz may pursue her breach of contract and wrongful discharge claim as alternative claims. See Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statement of a claim . . . alternatively . . . ."); Fed. R. Civ. P. 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency.") We therefore reject PMHC's argument to the contrary and deny PMHC's Motion to Dismiss insofar as it advances this argument.

PMHC also points out, however, that Pennsylvania has generally limited claims for wrongful discharge in violation of public policy to situations in which an employer requires an employee to commit a crime, prevents an employee from complying with a statutorily-imposed duty, or discharges the employee in violation of a statute prohibiting discharge, or where the termination violates a public policy that is "'so obviously for or against public health, safety,

morals, or welfare that there is a virtual unanimity of opinion in regard to it.'" Stewart v. FedEx Express, 114 A.3d 424, 427-28 (Pa. Super. Ct. 2015) (citing and quoting Mikhail v. Pa. Organization for Women in Early Recovery, 63 A.3d 313, 316–17 (Pa. Super. Ct. 2013)). Gratz maintains that the Complaint alleges such situations because it alleges that (1) PMHC discharged her in violation of the Pennsylvania Whistleblower Law, and (2) her discharge prevented her from complying with a statutory duty to report "flagrant misappropriation and conversion of the assets of a nonprofit corporation." (Gratz's Mem. in Opp. to PMHC's Mot. at 55.)

We conclude that Gratz has sufficiently alleged that she was wrongfully discharged in violation of public policy insofar as she alleges that PMHC discharged her in violation of the Pennsylvania Whistleblower Law, which is a statute prohibiting discharge.[7] Stewart, 114 A.3d at 428 (citation omitted); see also Denton v. Silver Stream Nursing & Rehab. Ctr., 739 A.2d 571, 577 (Pa. Super. Ct. 1999) (holding that claim under Whistleblower Law falls under the public policy exception to the at-will employment rule). We therefore reject PMHC's claim that the Complaint does not adequately allege a violation of public policy that supports a claim for wrongful discharge of an at-will employee. Consequently, we deny PMHC's Motion insofar as it seeks dismissal of the wrongful discharge claim.

---

[7] Because we conclude that Gratz's wrongful discharge claim may proceed on this basis, we need not reach her argument that her discharge was also wrongful because it prevented her from complying with her statutory duty to report that PHMC was misappropriating funds. We nevertheless note that Gratz has not identified any statute that imposes such a duty. Furthermore, the primary case upon which she relies, Appellant v. Appellees, No. 145 MAP 2014, 2015 Pa. Lexis 458 (Pa. March 2, 2015), held only that the Pennsylvania Rules of Professional Conduct did not prohibit an attorney from reporting wrongdoing by a charity. Id. at *3 (citing Pa. R. Prof. Conduct 1.6.) Thus, that case in no way supports a conclusion that an accountant such as Gratz has a statutory duty to report wrongdoing.

## IV.    CONCLUSION

For the foregoing reasons, we deny both Motions to Dismiss.    An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____

John R. Padova, J.