# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| CARYN GRATZ | CIVIL ACTION |
|---|---|
| v. | NO. 16-3799 |
| KEREY RUGGIERO, et al. | |

**MEMORANDUM RE: SUMMARY JUDGMENT**

Baylson, J.                                                                                          August 9, 2019

## I. Introduction

In this case, brought by the former COO of a nonprofit against the organization, related entities and officers, Plaintiff alleges that the organization employed a scheme to defraud Medicaid.

Plaintiff Caryn Gratz has brought claims for violations of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) and (d) against Defendants Kerey Ruggiero (now Kerey Parnes), Donna Moran, Staffmore, LLC ("Staffmore"), Behavioral Healthworks, LLC ("Healthworks"), Ruggiero LLC ("Ruggiero"), and Anthony A. Wolf, LLC ("Wolf").[1] Plaintiff's claims arise from her employment at the Philadelphia Mental Health Clinic, Inc. ("PMHC"). Plaintiff worked at PMHC twice—from the late 1990s through 2004 or 2005 as Agency Director and again from January 2015 through February 2016 as the Chief Operating Officer ("COO"). (Def. Statement of Undisputed Material Facts ("SUMF"), ECF 84-2

---

[1] Plaintiff also brought claims against Philadelphia Mental Health Clinic, Inc. ("PMHC"), but it was dismissed from this action with prejudice on March 7, 2019 after reaching a settlement agreement with Plaintiff. (ECF 93.) Plaintiff voluntarily dismissed her claim against the Ruggiero Defendants of tortious interference with an employment contract. (Mot. to Dismiss Memo., ECF 19 at 4, n. 1.)

¶¶ 5-6.) The gist of Plaintiff's argument is that "Defendant Parnes, through her control of PMHC and the other Defendants, generated Medicaid payments through PMHC, then, with Moran's active assistance, rather than devoting these funds to PMHC's charitable purpose as required by law, diverted large portions of those payments to her own benefit." (Resp., ECF 99 at 105.)[2]

Defendants move for summary judgment on all claims. (Mot., ECF 84.) Defendants' motion argues primarily that Plaintiff lacks standing to bring a claim under RICO. (Mot. at 7-11.) Defendants also assert that they cannot be liable under RICO because Plaintiff has not identified predicate acts of racketeering, and that Plaintiff's RICO conspiracy claim fails because there is no participation claim. (Mot. at 11-13, 15-16.)[3]

For the reasons that follow, Defendants' motion is granted.

## II. Undisputed facts[4]

### A. The Defendants

PMHC is a nonprofit that provides behavioral health services, particularly treatment to children on the autism spectrum. (Def. Statement of Undisputed Facts ("DSUF"), ECF 84-2 ¶¶ 1, 3.) During the relevant time, PMHC was reimbursed for health care services to Medicaid-eligible

---

[2] Plaintiff filed Response as a 147 page document that includes Plaintiff's response to Defendants Statement of Facts (Resp. at 7-18), Plaintiff's "Summary of Additional Facts" (Resp. at 18-90), and the "Argument" (Resp. at 91-146). The Court cites to the specific portions by using page or paragraph numbers where appropriate.

[3] Defendants additionally argue that Plaintiff should not have whistleblower protection because she "has never gone to any governmental authority to cooperate." (Mot. at 13-15.) This argument is not addressed in this Memorandum because Plaintiff's claim for a violation of the Pennsylvania Whistleblower Act, 43 Pa. Stat. Ann. § 1421 et seq. was brought only against Defendant PMHC, who has been dismissed from this case with prejudice. See note 1 supra.

[4] The Court will occasionally reference paragraphs from the Defendants' Statement of Undisputed Material Facts ("DSUF") and from Plaintiff's Summary of Additional Facts ("PSAF") or either parties' response thereto. The Court is not relying on the statements of facts as evidence; it is using the reference merely as shorthand to refer to the exhibits listed in the statement of facts' paragraphs.

children, authorized by Community Behavioral Health ("CBH") and Magellan Health. (Pl. Summary of Additional Facts "PSAF" ¶¶ 74-77, PSAF Resp., ECF 105, ¶¶ 74-77.)

Defendant Kerey Parnes (previously Ruggiero) is the CEO of PMHC and President of Staffmore. (DSUF ¶¶ 4, 7.) Parnes's father founded PMHC in 1953. (DSUF ¶ 2.)

Defendant Staffmore is a company that provides independent contractor clinicians and administrative support for behavioral healthcare providers. (DSUF ¶ 8.) Parnes created Staffmore around 2005. (PSAF ¶¶ 94, 95.) Staffmore provided PMHC with staffing for services such as clinician, human resources, payroll and accounts payable, administrative compliance, and electronic training functions. (Resp. Exs. 50-56.)

Defendant Donna Moran is currently retired, but previously worked at PMHC in "various capacities" and was the Executive Director at Defendant Staffmore. (DSUF ¶ 9.)

Defendants Wolf and Ruggiero serve as holding companies for real estate, and Parnes holds a controlling interest in both companies. (DSUF ¶¶ 12-13.)

Defendant Healthworks is "a defunct Pennsylvania LLC which was in the business of providing information technology and marketing services to health care businesses." (DSUF ¶ 14.) Parnes was the founder and majority owner in Healthworks, owning 80-90% of the shares, and her son owned the rest. (Parnes Dep., Resp. Ex. 30, 76:3-20; PSAF ¶ 71.) Healthworks was under contract with PMHC to provide IT services, including, among other things "backup support." (Resp. Ex. 70.) Healthworks also provided PMHC with marketing and social media services. (Ex. 72.)

### B. Plaintiff's employment history

Plaintiff has an undergraduate degree in Psychology from Rochester University and a Master of Social Services from Bryn Mawr College. (DSUF ¶ 16.) After obtaining her master's

degree, Plaintiff worked for about six months as a clinician at CBH, one of PMHC's largest funders, where she ran the children's division. (DSUF ¶ 18.) In 1999, Plaintiff left CBH to become an Agency Director at PMHC. (DSUF ¶ 19.) In that position, Plaintiff "interfaced with PMHC's funders, principally CBH and Magellan." (DSUF ¶ 21.) Plaintiff remained at PMHC for five years.

During her five years at PMHC, Plaintiff worked with Parnes to create the now defunct staffing agency Delaware Valley Children's Health Management ("DVCHM"). (DSUF ¶¶ 23-24, 26.) Plaintiff owned twenty percent of DVCHM, and Parnes owned eighty percent. (DSUF ¶¶ 24, 26.) Plaintiff left PMHC around 2004 or 2005 because she was "uncomfortable with the direction of the organization" because she "felt like there were monies being taken off . . . and used for personal purposes. . . . Kerey was building a home and I felt like some of the money, the Medicaid money was going to the building of her home." (DSUF ¶ 26; Gratz Dep., Mot. Ex. 3 at 30:23-31:12.) Plaintiff also testified that she did not have access to the checks and bills at PMHC at that time and did not report her concerns to anyone. (Id. at 34:16-17, 35:14-18.)

After leaving PMHC, Gratz worked in a compliance function at other health care agencies, where she was "responsible for compliance with the various regulations that governed the provision of behavioral health services to disabled recipients." (Pl. Resp. to DSOF ¶¶ 29-31.)

Before returning to PMHC in 2015, Plaintiff was the Managing Director of Behavioral Health Services at the Public Health Management Corporation ("PHM"), where she was making approximately $125,000 per year. (DSUF ¶¶ 32, 33.)

    C.    **Plaintiff's work at PMHC**

Plaintiff returned to PMHC as the COO in 2015. (DSUF ¶ 34.) During the interview process, Plaintiff did not raise concerns she alleges to have had "about her suspicion that Parnes .

4

. . had used PMHC funds to build her house some ten years earlier." (DSUF ¶ 35; Pl. Resp. to DSUF ¶ 35.) Rather, Plaintiff "discussed the expectations for her role at PMHC and what she would bring to the organization as COO." (DSUF ¶ 36.)

Once she was working as COO, Plaintiff "reviewed various reports," including "patient census information, authorization units utilized, and the amount of service a particular staff person provided." (DSUF ¶ 38.) On a weekly basis, Plaintiff reviewed "billing going out and cash coming in from CBH," and she met with CBH's billing specialist weekly. (DSUF ¶ 39.) Plaintiff and Parnes disagreed about the direction of future projects, including a potential endeavor in Florida. (See, e.g., PSAF ¶ 180.)

Plaintiff was terminated from PMHC on February 2, 2016. (PSAF ¶ 229.) During the termination meeting, Plaintiff refused to sign a release in exchange for two months of pay. (Gratz Aff., Resp. Ex. 39, ¶ 86; PSAF at ¶ 230.)

### III. Procedural history

Plaintiff filed her complaint on July 13, 2016. (ECF 1.) All defendants filed motions to dismiss in early September 2016. (ECF 10 & 11.) On May 19, 2017, Judge Padova, to whom this case was originally assigned, denied the motions. (ECF 20.)[5] Defendants answered the complaint, and discovery ensued. On July 30, 2018, the case was reassigned to this Court. (ECF 56.)

On January 4, 2019, all defendants moved for summary judgment (Mot., ECF 84, PMHC Mot., ECF 81.) Plaintiff filed an omnibus response on February 6, 2018. (ECF 88.) On March 7,

---

[5] In relevant part, Judge Padova analyzed Defendants' argument that Plaintiff lacked RICO standing, ultimately concluding "without the benefit of legal argument on this point, we decline to conclude at this stage of the proceedings that the alleged predicate acts based on Gratz's hiring, employment, and firing are not sufficiently related to the racketeering scheme to be pertinent to our standing analysis." (ECF 19 at 10.)

5

2019, Defendant PMHC was dismissed from the action with prejudice when it reached a settlement agreement with Plaintiff. (ECF 93.)

The Court then ordered Plaintiff to revise their response to comply with the Court's standing procedural rules. (ECF 95.) Plaintiff did so, but responded to the PMHC motion, rather than the moving Defendants' motion, so the Court ordered again that Plaintiff correct her response. (ECF 97.) The Court ordered that Plaintiff's responsive "Summary of Facts" would be stricken as non-compliant with the Court's rules and that Plaintiff should refile a brief responding to the correct motion. (ECF 98.) The Court also required Plaintiff to file a revised RICO Case Statement. (Id.)

Plaintiff filed a revised response on May 27, 2019 (Resp., ECF 99), and filed her RICO Case Statement on June 3, 2019 (RICO Case Stmt., ECF 103).[6] Defendants replied to the Response on June 10, 2019. (Reply, ECF 104-105.)

The Court held oral argument on the motion on June 25, 2019.[7] The parties were directed to file supplemental responses to the questions raised at oral argument, and both did so. (Pl. Suppl. Br., ECF 111; Def. Suppl. Br. ECF 114.) As directed by the Court, Defendants also filed a response to Plaintiff's affidavit (Def. Resp. to Aff., ECF 112), and Plaintiff replied. (Pl. Reply to Def. Resp. to Aff., ECF 113.)

## IV. Legal standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[6] On June 17, 2019 the Court granted Plaintiff's Motion to Amend her response. (ECF 107.)

[7] Neither party has ordered a transcript of the oral argument, but the audio file of the argument can be found on the docket at ECF 110.

a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. Under Federal Rule of Civil Procedure 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Id. at 255.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." Id. at 325.

After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule, [] set forth specific facts showing a genuine issue for trial." Stell v. PMC Techs., Inc., No. 04-5739, 2006 WL 2540776, at *1 (E.D. Pa. Aug. 29, 2006) (Baylson, J.) (citing Fed. R. Civ. P. 56(e)); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (The nonmoving party "must do more than simply show that there is some metaphysical dispute as so the material facts."). Summary judgment is appropriate if the adverse party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

7

**V.     Discussion**

Defendants assert that summary judgment should be granted in their favor on the RICO claims because Plaintiff does not have standing to bring a claim. (Mot. at 7.) Defendants also contends that Plaintiff has not demonstrated a claim under 18 U.S.C. § 1962(c) for participation, and therefore cannot make out a claim under § 1962(d) for conspiracy, which requires a violation of subsection (a), (b), or (c). (Id.) Because the Court concludes that Plaintiff does not have standing to bring this RICO claim, Defendants' arguments as to Plaintiff's substantive RICO claims are not addressed. See Knit With v. Knitting Fever, Inc., 2012 WL 2938992 at *2 (E.D. Pa. July 19, 2012) (Buckwalter, J.) aff'd sub nom. The Knit With v. Knitting Fever, Inc., 625 F. App'x 27 (3d Cir. 2015) ("Because the Court finds that Defendants' standing argument precludes Plaintiff from further pursuing its RICO actions, the Memorandum focuses solely on the discussion of that issue.")[8]

**A.     Legal standard governing standing under RICO**

In order for Plaintiff to have standing to bring this case in federal court, she must demonstrate both constitutional and statutory standing.

To satisfy the constitutional test for standing under Article III, Plaintiff must suffered an "injury in fact," and the injury must be traceable to the challenged action of the Defendants. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To satisfy the statutory test for standing under the RICO statute, 18 U.S.C. § 1964(c), Plaintiff must demonstrate "(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." Maio v. Aetna, Inc., 221

---

[8] The Court notes however, that based upon the record before us and as discussed at oral argument, the Court is doubtful that Plaintiff would be able to identify acts of racketeering significant to support a RICO claim, were she to have standing.

F.3d 472, 483 (3d Cir. 2000). The violation must be the proximate cause of the injury, meaning that there is a "direct relation between the injury asserted and the injurious conduct alleged." Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992); see also Dental Wizard G PC v. Aranbayev, 2018 WL 6268298, at *3 (E.D. Pa. Nov. 30, 2018) (Bartle, J.) ("To give rise to a RICO claim, a plaintiff must allege not only a causal connection between the defendants' action and the plaintiffs' injuries but also that any causal connection is proximate, that is, not too remove.").

The Supreme Court has held that a RICO plaintiff's injury must be caused by a "predicate act," that is, one that is an independently sufficient bases for RICO liability. Beck v. Pupris, 529 U.S. 494, 504-05 (2000). A "predicate act" under RICO may be any number of criminal activities listed in 18 U.S.C. § 1961(a). The list in the RICO statute is exhaustive. Annulli v. Panikkar, 200 F.3d 189, 200 (3d Cir. 1999), abrogated on other grounds by Rotella v. Wood, 528 U.S. 549 (2000).

In Beck, the Supreme Court affirmed the district court's conclusion that a former CEO, director, and shareholder of an insurance group, who was terminated when he reported the company defendant's alleged racketeering to regulators, did not have standing under RICO. 529 U.S. at 498. The Supreme Court resolved a circuit split, holding that "injury caused by an overt act that is not an act of racketeering or otherwise wrongful under RICO . . . is not sufficient to give rise to a cause of action under § 1964(c) for a violation of § 1962(d)." Id. at 505.[9]

---

[9] Plaintiff relies upon Khurana v. Innovative Heath Care Sys., Inc., 130 F.3d 143 (5th Cir. 1997), a case that was abrogated by the Supreme Court's decision in Beck.

B.   Analysis

The injuries Plaintiff claims are "from resigning her job with her previous employer, deprivation of her right to make economic decisions based on truthful information, injury to her reputation and injury from her termination." (Resp. at 128.) Plaintiff asserts that the RICO enterprise is "an association-in-fact enterprise made up of Parnes, Moran, [Wolf], [Healthworks], [Ruggiero] and Staffmore and former co-Defendant Philadelphia Mental Health Clinic, Inc." (RICO Case Stmt. at 5.) Plaintiff asserts that the "structure of the enterprise is evidenced through a decade of payments from PMHC to directly to Parnes, Moran and to the for-profit corporate defendants for unauthorized, and therefore unlawful services, phantom services, or other predatory business arrangements, some (but not all of which) Parnes and Moran reduced to written contracts." (Id.)

Plaintiff contends that the unlawful RICO enterprise involved the commission of four predicate acts: (1) Wire Fraud under 18 U.S.C. § 1343; (2) Money Laundering under 18 U.S.C. § 1956; (3) Mail Fraud under 18 U.S.C. § 1341; and (4) Witness Tampering under 18 U.S.C. § 1512. (Resp. at 111.) Plaintiff argues that her injuries were caused by PMHC's predicate acts of mail and wire fraud and witness tampering. (Resp. at 128.)[10]

Defendants first argue that these alleged injuries are not redressable by RICO. Defendants also assert that even if the injuries were redressable, they were not proximately caused by an act of the Defendants. (Mot. at 7-9.) Moreover, Defendants contend that Plaintiff has "developed no credible evidence to demonstrate proximate cause between her claimed injury and the purported RICO acts." (Reply at 4.)

---

[10] To support this argument Plaintiff relies upon a section in her "Summary of Facts" entitled "Defendants' Wrongful Conduct that Caused Plaintiff's Injuries." (PSAF ¶¶ 148-234.) This summary of facts, spanning nearly fifty pages of the brief, cites mostly to Plaintiff's affidavit.

10

### 1. Plaintiff's injuries may be redressable by RICO

Defendants first argue that the injuries alleged by Plaintiff—economic harm and harm to her reputation—are not redressable by RICO. (Mot. at 9.) Defendants assert that Plaintiff's lost income is not compensable unless it is "directly caused by a predicate act." (Id.) Defendants argue that reputational harm is a "personal injury such as mental or emotional distress [that] does not constitute injuries to business or property." (Id.)

To the extent that Plaintiff's injuries relate to her termination from PMHC, Defendants assert that the only defendant involved in her termination was Parnes, and that she was acting as the CEO of PMHC when she terminated Plaintiff. Plaintiff alleges that she had a "property interest" in her employment at her former job and claims that because Parnes was acting as the CEO of PMHC, "her actions are attributable to Defendant PMHC and thus to the other enterprise as well." (Resp. at 130-31.)

Defendants have not presented case law concluding that reputational harm is *per se* not compensable under RICO. To seek recovery under RICO, a person must allege an injury to "business or property," which excludes "personal injuries." Zimmerman v. HBO Affiliate Grp., 834 F.2d 1163, 1169 (3d Cir. 1987) (citing 18 U.S.C. § 1964). In Zimmerman, the Third Circuit held that a plaintiff who alleges "only injury in the nature of mental distress" has not alleged an injury sufficient to confer standing under RICO. Id.

Defendants cite Kennedy v. Pennsylvania, 2018 WL 5977968 at *7 (E.D. Pa. Nov. 14, 2018) (Smith, J.), where Judge Smith dismissed a RICO claim for failing to adequately plead a violation based upon a predicate act of mail fraud. In a footnote, Judge Smith noted "[t]o the extent that [Plaintiff] seeks damages for his mental and emotional distress, those types of injuries are not injuries to 'business or property' for purposes of RICO." Judge Smith cites a Middle

11

District of Pennsylvania case where Judge Caputo observed that "[m]ental distress, emotional distress, and harmed reputations do not constitute injury to business or property sufficient to confer standing on a RICO plaintiff. . . . [and] injury for RICO purposes requires proof of concrete financial loss, not mere injury to an intangible property interest." Id. (quoting Clark v. Conahan, 737 F. Supp. 2d 239, 255 (M.D. Pa. 2010) (Caputo, J.)); see also Knit With, 2012 WL 2938992, at *10, ("Claimed losses to goodwill and reputation are not only speculative, but are simply not the types of injuries compensable under RICO.")

In this case, Plaintiff has certainly alleged that her reputation was integral to her ability to sustain work at the executive level of social service organizations and medical providers. (See Lucas statement, Resp. Ex. 38; Pl. Suppl. Resp., ECF 111, Ex. A, Letter from Regan Kelly.) Accordingly, the Court concludes that Plaintiff has alleged injury that *may* be compensable by RICO. These alleged injuries must, however, be the proximate cause of predicate acts of racketeering activity to confer standing on Plaintiff under RICO.[11]

### 2. Plaintiff has not demonstrated that her injuries were proximately caused by predicate acts of racketeering activity

Defendants next contend that Plaintiff has not put forth evidence to demonstrate that her alleged injuries were proximately caused by predicate acts of racketeering activity. (Mot. at 10.) As noted above, Plaintiff alleges that her injuries were a result of wire and mail fraud and witness tampering. (Resp. at 128-141.)

#### a. Plaintiff's alleged injury resulting from wire and mail fraud

Wire fraud involves a situation where a person makes "representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in

---

[11] The Court makes no conclusion, in evaluating whether Plaintiff's injuries are compensable by RICO, as to whether other defendants aside from Parnes could be liable.

12

interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1343.

Mail fraud involves a situation where

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to eb delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing.

18 U.S.C. § 1341.

Plaintiff claims that her alleged loss of income and reputational harm result from her termination and her leaving PHM to join PMHC and that Defendants "entice[d] her to forfeit her employment and prospects at PHM . . . to further the most essential part of the scheme—generating the medical assistance funds vital to create the pool of money (or proceeds) that Parnes' would eventually steal." (Resp. at 134.)

Plaintiff argues that she was fraudulently induced to leave her former job with (1) the "prospect of becoming the executive director of PMHC upon Parnes' intended retirement in a few short years," and (2) Gratz's false belief that "she would be able to freely manage expense-side obstacles that contributed to PMHC's precarious financial health and that revenue shortfalls

13

were… merely the result of a lack of bureaucratic cooperation from funders." (Resp. at 131.) Plaintiff also contends that Defendants intended Gratz to "mislead CBH into believing that she was actually in control of PMHC, instead of the rapacious Parnes" [because] "Parnes was well aware of Gratz'[s] reputation with CBH, her reputation for ethics and her reputation for dedication to the disadvantaged children she served in each of her previous positions." (Resp. at 132.)

Plaintiff asserts, without legal citation, that "the protection afforded by the mail and wire fraud statutes extends to intangible assets and includes the right to have material information necessary to make economic decisions." (Id. at 131.)

In Plaintiff's supplemental brief, she attempts to identify record support for her assertion that her injury was caused by the predicate act of mail or wire fraud. As she did at oral argument, Plaintiff relies upon statements about Parnes's recruitment of Gratz to PMHC in 2014-2015, noting that "[b]y October and November 2014 Parnes and I had several meetings and phone calls during which, Parnes became more aggressive in her efforts to recruit me." (Gratz Aff. ¶¶ 18, 32-33.) The rest of the affidavit describing the recruitment process reference the conversations generally without reference to email or telephone. (See id. ¶¶ 19-21, 23-28.) Other paragraphs describe information that Gratz alleges Parnes failed to disclose during those conversations. (See id. ¶ 23.) Gratz also testified that she received her employment contract via email in December 2014. (See id. at ¶ 30.)

Defendants argue that Plaintiff has "identified no unlawful act related to this recruiting process" and that she has "developed no credible evidence to demonstrate proximate cause between her claimed injury and the purported RICO acts." (Mot. at 10; Reply at 3.) Moreover, Defendants contend that the party that would have been injured by Defendants' alleged mail and

wire fraud would have been the public fisc, rather than Plaintiff herself. (Mot. at 11.) Defendants point out that "Parnes was forthcoming that PMHC needed help after several unsuccessful years, and that Parnes thought Gratz was capable of improving the situation. As it turns out, Parnes and Gratz had a different vision for PMHC." (Reply at 5.)

The Court notes initially that Plaintiff may very well have a difficult time demonstrating that the telephone and email communication was a predicate act of racketeering. More importantly for this discussion, however, Plaintiff has failed to connect any alleged wire and/or mail fraud with her alleged injury. Although the Court accepts that Plaintiff may have had conversations with Parnes over the telephone and email about joining PMHC, that alone is insufficient to link Plaintiff's harm to this alleged predicate act. The record and Plaintiff's filings and argument in court are utterly devoid of any specific identification of a causal nexus. Rather, the evidence put forward by Plaintiff demonstrates that she engaged in negotiations with Parnes, and voluntarily left her position to join PMHC.

It is worth noting that Plaintiff concedes that "[h]ad Gratz solicited PMHC for a position, applied for one in the regular course of seeking out new employment opportunities, discovered Parnes' greedy scheme and walked off the job on moral principle, her injury from forfeiting her opportunities at her previous employer and subsequent damage to reputation might, arguably, not meet the standard for injury directly related to an act of racketeering. But that is not the case here." (Resp. at 133.) The Court has been presented with no evidence to support Plaintiff's assertion that the process of her recruitment was so misleading that it would support her RICO claim. Moreover, to the extent that Plaintiff did suspect mishandling of funds by Parnes and then voluntarily rejoined the organization years later, she may have reasonably believed the same issues were ongoing.

Because the Court finds that Plaintiff has failed to sufficiently demonstrate that any alleged financial injury she suffered by leaving her former job was connected to the alleged predicate act of wire and mail fraud, this alleged injury cannot form the basis for standing under RICO.

### b. Plaintiff's alleged injury resulting from witness tampering

Plaintiff also alleges that her injuries were a result of Defendants' acts of witness tampering under 18 U.S.C. § 1512. Plaintiff relies upon § 1512(b)(3), (c)[12], and (d) as potential bases for liability. These statutes define witness tampering as:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
> . . .
> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation1 supervised release, parole, or release pending judicial proceedings;
>
> (c) Whoever corruptly--
> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> (d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from--
> (1) attending or testifying in an official proceeding;
> (2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense

The threshold question for liability here is whether there could have been an official proceeding. As Plaintiff correctly points out, under § 1512(f)(1), "an official proceeding need not

---

[12] Plaintiff appears to only argue that (d)(1) and (2) are "pertinent" to her case, and thus the Court focuses upon those sections. (Resp. at 116-17.)

16

be pending or about to be instituted at the time of the offense." In order for there to be liability under § 1512, however, there must be "[a] reasonable belief that the named witness will communicate information to a law enforcement officer." U.S. v. Davis, 183 F.3d 231, 248 (3d Cir. 1999).

Plaintiff testified to the factual basis of her witness tampering claim in her affidavit, where she testified that she began to learn of "instances of self-dealing between Parnes and PMHC" toward the end of her employment. (Gratz Aff. ¶¶ 56-59.) Plaintiff testified that she raised her concerns about self-dealing with Geoffrey Rupprecht, PMHC's CFO, and Jordan Weisman, PMHC's Director of Clinical Services, in December 2015 and January 2016. (Id. at ¶¶ 68, 70.) Plaintiff also testified that on January 12, 2016, she met with Nancy Lucas, former Executive Director of CBH and "disclosed what I knew of Parnes'[s] conduct. I expressed my strong suspicion that no PMHC Board existed." (Id. at ¶ 71.) Plaintiff claims that after that meeting, she requested that Rupprecht "look for PMHC's Articles of Incorporation and Bylaws," and that Rupprecht "told me that he did not see his conduct as illegal because Parnes represented that she obtained Board approval for the multitude of PMHC financial disbursements that enriched her." (Id. at ¶¶ 72-73.)

On January 26, 2016, after hearing about the indictment of a behavioral health nonprofit CEO for healthcare fraud, Plaintiff allegedly told Rupprecht that they should make copies of the "self-dealing contracts and Parnes's representations about Board approval, and turn them over to the Attorney General and any one else in the government who has oversight of PMHC as a Medicaid funded entity." (Id. at ¶ 79.)

The next day, Plaintiff testified that she overheard a conversation between Rupprecht and Parnes about classifications of income Rupprecht had made on forms PMHC was required to file

17

with the IRS. (Id. at ¶ 80.) Plaintiff testified that during that call, which was on speakerphone and to which Gratz was listening, Parnes asked "very pointed questions about what documents I had asked him for, and specifically asked if I had asked him for PMHC's General Ledger." (Id. at ¶ 81.) Parnes allegedly "went on to say that she did not trust me or my motives, but knew she could depend upon Rupprecht's loyalty to her and PMHC, and that she trusted that Rupprecht would tell her anything she needed to know about me." (Id.) Plaintiff testified that an argument between she and Rupprecht ensued and that two days later, Parnes was "uncharacteristically hostile" toward her. (Id. at ¶¶ 82-83, 84.)

Plaintiff was terminated three days later, on February 2, 2016. (Id. at ¶ 85.) During the termination meeting, at which Parnes's lawyer was present, Plaintiff testified that Parnes handed her a "Confidentiality and Release Agreement" and told her that if she signed it, she would receive two months of salary "now." (Id. at ¶ 86.) Plaintiff testified:

> Neither Parnes nor [her lawyer] advised me that I had time to review the Release or an opportunity to rescind my agreement with its terms. When I told Parnes I would not sign anything there she took the Release from me and said the offer was "off the table" unless I signed there and then. The Release was more than one page and possibly several pages as I saw no signature area on the face of the release. It also contained writing in small font and single-spaced paragraphs. It was not the "Termination Agreement" that Defendants produced in discovery.

(Id.)

Gratz testified that she had "no idea what she—Kerey and others had access to in terms of my efforts to make sense out of what was going on out there. (Gratz Dep. at 221:3-5.)

According to Plaintiff, "[t]he termination with the bribe, taken separately or viewed together, clearly demonstrate[] that Parnes[] intended to obstruct or delay an official proceeding, and that she intended to delay or prevent Gratz from reporting the commission of a federal

18

offense." (Resp. at 125-26.) Plaintiff also contends that her termination was "designed to intimidate and harass other PMHC employees from reporting Parnes' unlawful conduct." (Id. at 126.)

In support of her witness tampering argument, Plaintiff relies upon Mruz v. Caring, Inc., 991 F. Supp. 701 (D.N.J. 1998) (Orlofsky, J.), where Judge Orlofsky granted in part the defendants' motion to dismiss, but denied the motion as to the RICO claims, concluding that the plaintiffs had standing under RICO based at least in part upon the predicate act of witness tampering under 18 U.S.C. 1512(b-c). Id. at 714-15. In Mruz, the plaintiff employees initiated an internal investigation into alleged health care fraud by sending a letter to the board of directors and contacting law enforcement. Id. at 705-07.

Defendants assert that Plaintiff "cannot transform what is at best a wrongful termination claim into a RICO enterprise based on alleged witness tampering. At the time, Gratz had not asked to meet with a government official nor was she under any subpoena, interview request, grand jury proceeding or other process which would make her a witness. To this day, Plaintiff has never gone to a government representative to report her concerns. Clearly, with her background in compliance, she knows (and knew) what was required." (Mot. at 14.)

The Court finds two flaws with Plaintiffs' argument that her standing is based upon the predicate act of witness tampering. First, although Plaintiff alleges that she mentioned to Rupprecht that documents should be collected, Plaintiff has not put forth any facts to demonstrate that Parnes or any other defendant had a "[a] reasonable belief" that Plaintiff would "communicate information to a law enforcement officer." Unlike the plaintiffs in Mruz, who voiced concerns and instigated an internal investigation, Plaintiff only complained to her co-worker about possible concerns she had. The closest factual scenario Plaintiff has identified that

19

may constitute witness tampering is when she was offered a payment in exchange for signing a release.

Second, even if the Court were to assume that Plaintiff's request that Rupprecht collect documents could have been leading to an official proceeding, or that Plaintiff has demonstrated that defendants had a reasonable belief she would go to authorities, there are other flaws with Plaintiff's claim. The only defendant who could plausibly be connected to injuries related to termination is Parnes, and she was arguably acting in her official capacity as CEO of PMHC when she terminated Plaintiff. Most importantly, Plaintiff has failed to put forward sufficient evidence to connect her injuries to alleged witness tampering. If any injuries resulted from the alleged witness tampering that occurred when she was terminated, it would have been a loss of income, and the proper remedy for that loss would be a wrongful termination suit, not an allegation of a RICO conspiracy.

Thus, Plaintiff does not have standing to bring her RICO claim based upon the alleged predicate act of witness tampering.

## VI. Conclusion

For the reasons set forth above, the Court concludes that Plaintiff does not have standing to bring a civil RICO claim against any Defendant. Accordingly, summary judgment will be granted in favor of Defendants.

An appropriate order follows.

O:\CIVIL 16\16-3799 Gratz v Ruggiero\16cv3799 MSJ Memo.docx